# Dillard v. Commonwealth.

January 31, 1947.

C. G. Rawlings for appellant.

Eldon S. Dummit, Attorney General, and J. L. Hughett, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellant, Jess Dillard, was indicted, tried and convicted in the Harlan circuit court under a charge of murdering Samuel (alias Leroy) Cargle on October 6, 1946. The punishment fixed by the jury was life imprisonment in the penitentiary. Appellant's motion for a new trial was overruled and from the judgment pronounced on the verdict he prosecutes this appeal.

In appellant's motion for a new trial he complains of only two alleged prejudicial errors authorizing a reversal of the judgment and which are (1) improper evidence introduced by the Commonwealth over his objections and exceptions and (2) improper and prejudicial argument of prosecuting counsel in addressing the jury and the failure of the court to discharge the jury upon his motion at the time each of those alleged errors were committed. For a thorough understanding of the case a substantial statement of the testimony will be given.

The homicide was committed about 3 P. M. on Sunday, October 6, 1946, at a spring located near a tipple of a coal mining operation at Verda, in Harlan County, Kentucky. One Tully and his brother-in-law operate an establishment therein designated "The Hall," but the nature of that business is not disclosed by the record; but from scattered statements of the witnesses it would appear to be a place where intoxicating liquors were sold. At any rate appellant entered that place in the forenoon of the fatal day when Tully, one of the proprietors, was in. Appellant remained there until about 2 P. M., but what he did while there until shortly before he departed is likewise undisclosed. A short while before his departure a woman who had come to the place, and who, according to the testimony of Tully, was considerably intoxicated, was approached and disturbed by appellant, but exactly in what manner the record is likewise silent.

Tully in giving his testimony as a witness for the Commonwealth in describing what happened voluntarily made the statement: "He (appellant) was trying to rob her and take money from her." Objection was made to that statement which the court sustained and admonished the jury to not consider it, and that is the evidence complained of in appellant's argument of ground (1). When Tully observed what appellant was doing, in molesting the intoxicated woman, he objected and interfered in her behalf and which superinduced a more or less animated quarrel and hostile demonstrations between the two. However, it resulted in no assault by either of them on the other.

Tully was then asked:

"Q. As he left your place did he say where he was going? A. Yes.

"Q. What did he say? A. He was going to get a gun to kill me.

"Q. After he left your place did you see him any more after this man was killed? A. Crossing the railroad with the shotgun."

He then stated that he heard the two shots that appellant fired, the first of which was the fatal one and

which occurred some thirty minutes after appellant had left his place of business. Another witness testified that she lived next door to appellant's sister from whom he procured a gun after leaving Tully's place of business and saw him departing therefrom with it. The wife of the witness, Tully, was appellant's niece, from which it would appear that he would not falsify the facts against his wife's uncle. The same witness also testified that he was not related to the deceased, nor did he know anything about him.

James Hopkins was another witness introduced by the Commonwealth, he being the only eyewitness to the homicide except appellant himself. That witness testified that he and the deceased in walking around Verda stopped at the spring, above referred to, to quench their thirst, when appellant was seen approaching the witness and the deceased. Witness then said:

"I was stooping down to get a drink out of the spicket, and he was squatting down, sitting there talking, and about that time Jess (appellant) come to the top of the hill with a shot gun and said, 'Get your hands up.' We rose to our feet. He said, 'I'm sorry, boys, I had you mixed up with Jim.' He come down where we were; I talked to him about putting the gun up. He said, 'G—d damn it, I'm going to kill Jim.' He squatted down with the gun across his knees and Leroy was squatting down. * * * Samuel Cargle—I call him Leroy, said, 'Did I ever do anything to you, Jess?' Jess said, 'No.' Jess said, 'Did I do you harm?' Leroy said, 'No.' They both said they were friends. I told Leroy, 'Skip it, he is looking for Jim. Let him go on and find Jim.' Nothing more said; Jess said, 'Like I feel this afternoon, I will do anything.' So in a few minutes he said again, 'I will kill any son of a b——that cross talks me.' Leroy said, 'You say, you will kill me, Jess?' He said, 'Your G——damn right, I will kill you.' Leroy got up and made two steps, and Jim said, 'Don't come no further, I will kill you.' He raised the gun and shot him down and reloaded, and acted like he was going to shoot me, and his feet slipped and the gun went off in the air.

"Q. After he killed Samuel Cargle, whom you call Leroy, he loaded his gun again, then what did he do with it? A. He reloaded it after he shot him and did

something like that, moved around, Leroy was in front of him; he had it on him and turned it on me and his feet slipped; it went off in the air and he said, 'G—— damn you, I will shoot your heart out!'; he had done killed him then.''

Witness testified that deceased had nothing in his hands, nor was he making any move toward appellant when the fatal shot was fired.

Defendant gave the only testimony in his behalf and in describing what had occurred and how it occurred from the time he went to the Tully store until deceased was killed he said:

''I was down to the Hall; my step-father and Jim Tully runs a Hall at Verda, they are together in the Hall. I was there in the morning, I was talking to my daddy-in-law, and Jim told me—there was a lady sitting in a chair—he said, 'You get out from in here.' I said, 'What's the matter, can't I talk to the old man;' he grabbed a hammer on me and told me to get out; the old man said, 'Go on, I don't know what is wrong with Jim.' He said, 'If I see you here today, I will shoot you.' I went to the house and the old lady said, 'Jess, I want you to go to the store.' I said, 'Alright.' I said, 'I'm going to take the gun.' I didn't go near Jim's. I went down the creek bank; this boy, Leroy and James was down at the spring. Me and Cargle never had words; Everything was all foolishness, playing. I said, 'What are you all doing down here,' so they raised up; they said, 'You ain't after us.' I said, 'No, boys, you know I'm not after you, you all ain't done nothing to me.' I never said a cross word with the man. I started on by, and squatted down; I started away, and Leroy, the fellow that got shot, he started toward me; he said something to me, I went around and when he called me, I went and raised the gun, and it went off. He was standing there and hadn't fell. I said, 'This gun went off.' I put another shell, and it went off in the trees again; this boy here said 'Jess, you done killed this boy.' I saw blood coming—I said, 'Get an ambulance and police.' I didn't know nothing else to do. Me and this boy never had no words in our life.''

In rebuttal Tully testified that he did order appellant out of his place of business because of his conduct

toward the woman who was present, but that he never threatened to shoot appellant at any time.

If the volunteered statement of witness, Tully, that the defendant was trying to rob the intoxicated woman who was in his place of business was improper, the court, as we have seen, admonished the jury to not consider it. However, we entertain grave doubts as to whether it was in fact improper, since it was a part of the history of what occurred in Tully's place of business just thirty minutes before the fatal shooting. It was the statement of the beginning of the disturbance between Tully and defendant resulting in the former ordering the latter from his premises thereby producing in him great anger and a spirit of lawlessness. But however that may be, we are confident that the admonishment of the court was sufficient to protect the rights of defendant and was therefore not prejudicial.

The second ground, as shown by the bill of evidence, relates to a statement made by prosecuting counsel in his closing argument to the jury. That statement as shown in the bill of exceptions was: "This defendant has made a widow and four little orphans and here they are before the jury." The objection to that statement was sustained by the court, who told the jury not to consider it, but it does not appear from the bill of exceptions, or otherwise that defendant then moved to discharge the jury and continue the case. If, however, such a motion had been made and overruled by the court, it is difficult for us to see how the statement, though possibly improper, was prejudicial since it had no relation to the crime that defendant had committed and should not have been made by counsel. As the statement itself shows—with nothing in the record to contradict it—the survivors of decedent were then present before the jury and, of course, they were told by counsel nothing more than what they plainly saw before them.

The statement of counsel made by him in the circumstances stated is but little, if at all, short of branding the members of the jury as a group of morons who could be deceived by counsel repeating a fact then before it and which its members already knew. We prefer to believe that the average juror is not unduly influenced

thereby in arriving at a verdict according to the evidence introduced.

In the cited cases by counsel in support of this ground, and in all others dealing with the question so far as we have been able to find, in which the judgment was reversed because of improper argument of counsel, the reversal was ordered because counsel stated material and prejudicial facts that nowhere appeared in the record, and which bore upon the question of defendant's guilt or innocence of the crime with which he was charged. The statement here could not possibly have any such effect, since the facts stated by counsel were—as above stated—manifested to the jury by the presence of decedent's survivors in court.

The only case cited in support of ground (2) is Jones v. Com., 213 Ky. 356, 281 S. W. 164, 168, in which appellant therein sought the reversal of his conviction of voluntary manslaughter. The killing took place in a "bootlegging joint," and the Commonwealth's attorney without any evidence in support thereof, in referring to the witnesses who testified in behalf of appellant said:

" 'Not one of them has sworn the truth for 15 years; they lay around pool rooms, smoke cigarettes, drink whisky and you may send one of them before the grand jury, and not one word of truth will they tell. * * * John Mullins is the biggest bootlegger in this country, and won't swear one word of truth. * * * If you believe a person charged with an awful crime like this, and with his host of bootleggers and lie swearers that he associates with and brings into court to testify in his behalf, you can never convict a person in the world.' "

The condemned remarks in that, and many other like cases wherein we reversed the conviction because thereof, bear no resemblance whatever to the complained of remarks in this case. Prosecuting counsel in that class of cases took advantage of his position and made a witness of himself by stating most prejudicial facts, nowhere, nor in any manner appearing in the record which, constitutes the only ground for the prejudicial effect that such remarks might have. No such reason for reversing the judgment herein appears in this case.

Notwithstanding the failure of counsel to argue or

rely upon other grounds for a reversal than the ones discussed, yet one of the undiscussed ones complains of failure of the court to properly instruct the jury. The court instructed the jury on all phases of homicide, and gave one on accidental shooting and another one submitting appellant's right of self defense, the latter of which was perhaps unauthorized under the evidence. Therefore, this unargued ground is unsustained by the record.

Wherefore, the judgment is affirmed.